HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GRAHAM-BINGHAM IRREVOCABLE TRUST, et al.,

    Plaintiffs,

  v.

DONALD TRUDEAU, et al.,

    Defendants.

CASE NO. C12-755RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the parties' motions for summary judgment. Plaintiffs requested oral argument solely as to their own motion. Defendants did not request oral argument. The court finds oral argument unnecessary. For the reasons stated below, the court GRANTS Plaintiffs' motion (Dkt. # 38) in part and DENIES it in part. The court DENIES Defendant's motion. Dkt. # 36. This order concludes with instructions for Defendant Donald Trudeau to indicate whether he will appear to defend himself at trial. If he does not comply with those instructions, he risks having the claims against him brought to judgment without his participation. The conclusion also contains instructions for Plaintiffs to indicate, depending on Mr. Trudeau's response to this order, how they intend to bring their claims to judgment.

ORDER – 1

## II.  BACKGROUND

Plaintiff Graham-Bingham Irrevocable Trust was the owner of a policy (the "Policy") insuring the life of Frances Graham.  The John Hancock Life Insurance Company issued the Policy.  The face value of the Policy's death benefit is or was $23 million, although its precise benefit depends on a host of variables that are of no relevance in this dispute.

The Policy required substantial annual premium payments to keep it in force.  In December 2009, the Trust received a notice from John Hancock that the Policy would lapse on February 20, 2010, unless the Trust made a payment of about $545,000.  Appel Decl. (Dkt. # 39), Ex. E.  The Trust was apparently unable to make the payment, so it commissioned a broker to look for third parties who would either buy the Policy or keep it from lapsing.  The broker, Chris Kosmos, contacted another broker, Kenneth Klein, who in turn contacted Donald Trudeau.  Among his other endeavors, Mr. Trudeau is the sole member of Defendant Greenwich Bay Management, LLC ("Greenwich Bay").  Plaintiffs (the Trust and its trustee, Henry Dean) have presented no evidence, however, that they knew Mr. Trudeau was a member or representative of Greenwich Bay until after most of the events that matter in this dispute.

It is unclear when Mr. Trudeau first learned of the Policy and its February 20, 2010 lapse date, but he undisputedly knew of it by sometime in February 2010.  He expressed some interest in either purchasing the Policy or loaning money for the premium payment to keep the Policy in force.  He expressed his views entirely by communicating with Mr. Klein, who relayed them either to Mr. Kosmos or Mr. Dean.  There is no evidence from which a jury could conclude that he reached any agreement with the Trust prior to February 20, nor did he definitively rule out an agreement.  The Trust, hoping that Mr. Trudeau would fund the premium payment, executed a promissory note on February 19, a Friday.  Appel Decl. (Dkt. # 14), Ex. C at 80.  The note was indorsed in blank.  *Id.*  Mr. Klein sent Mr. Trudeau an email that day with instructions for

ORDER – 2

wiring payments directly to a John Hancock account. Appel Decl., Ex. G at 111. The email acknowledged that Mr. Trudeau had made no agreement to pay anything, but urged him to act by the end of the day if he decided to pay:

> I wanted to send you the wiring instructions for Graham's John Hancock policy in case you decide to buy the policy today. It may be a long shot, but I wanted to ensure you had the information in case you needed it. If you do pull the trigger, the wire should go out by at least 4pm EST.

*Id.*

On February 20, a Saturday, Mr. Trudeau went to a Citibank branch. He signed a check from Greenwich Bay for $554,000 and deposited it directly to the John Hancock account that Mr. Klein had designated. Appel Decl. (Dkt. # 39), Ex. F at 103. He knew at the time that the Greenwich Bay bank account from which the check was drawn had nowhere near enough money to cover the check.

On February 22, a Monday, Mr. Trudeau emailed Mr. Klein the receipt he received from the February 20 deposit. Appel Decl. (Dkt. # 39), Ex. L. The email included no substantive text except the phrase "dep slip." *Id.* The email's footer indicated that Mr. Trudeau was the President of "Benistar Admin Services, Inc." *Id.* The email address that Mr. Trudeau used was "dtrudeau@benistar.com." Mr. Trudeau used the same email address (and frequently the same footer) throughout his correspondence with Mr. Klein. Mr. Klein's office forwarded Mr. Trudeau's February 22 email to Mr. Kosmos.

Also on February 22, Mr. Klein provided Mr. Trudeau with a copy of the promissory note the Trust had issued. He noted correctly that the $550,000 figure stated on the note was less than the $554,000 that Mr. Trudeau had supposedly paid, and pointed out that the note did not state to whom it was payable. Appel Decl. (Dkt. # 39), Ex. G at 113. The email also suggested that the maturity date of the note in May 2010 be advanced to March 2010. *Id.* Mr. Trudeau made no objection to the form of the note, and he made no request as to whom the note should be made payable.

ORDER – 3

On February 23, the bank on which the $554,000 check was drawn sent Greenwich Bay a notice that there were insufficient funds in the account to cover the check. Appel Decl. (Dkt. # 39), Ex. K. Mr. Trudeau notified no one.

The Trust, through Mr. Klein and Mr. Kosmos, continued in its efforts to sell the Policy. Mr. Trudeau continued to demonstrate interest in buying. By March 2010, Mr. Kosmos had another potential buyer, and he urged Mr. Klein to have Mr. Trudeau put a formal competing offer on the table. Appel Decl. (Dkt. # 39), Ex. G at 114. The March email communications among Mr. Kosmos, Mr. Klein, and Mr. Trudeau make clear that Mr. Trudeau had still not revealed that the $554,000 check had bounced. *Id.*

In April 2010, Mr. Klein again pressured Mr. Trudeau to make the Trust an offer. Appel Decl. (Dkt. # 39), Ex. F at 96-97. He explained that an offer from another party was coming soon. *Id.* Mr. Trudeau stated by email only that he was "Committed to Graham." *Id.*

By May 6, a third party had made a formal offer to buy the Policy from the Trust for a gross sum of about $3.2 million. Appel Decl. (Dkt. # 39), Ex. I. At some time not long before that, Mr. Klein, Mr. Kosmos, and perhaps others had discovered that there were problems with the $554,000 check. They assumed initially that the bank had made an error. No later than May 5, Mr. Klein asked Mr. Trudeau to provide a copy of the check. He made that request repeatedly over the next several days, and Mr. Dean eventually joined in making the requests. Appel Decl. (Dkt. # 39), Ex. G at 119 (May 5 email: "Where's a copy of the $550,000 February 20 check? Hopefully marked 'Paid'"), at 120 (May 5 email "Are you or are you not going to get me a copy of this check?"), at 122 (May 6 email "The Graham family is watching a $3.2mm offer evaporate if you can't prove that your premium payment was honored by your bank"), at 124 (May 11 email: "Will you be able to provide me today with a summary of exactly what happened with your Feb. 20 premium payment?"), at 135 (May 12 email from Mr. Dean: "It is imperative that I understand all the facts surrounding the check issued by you to John

ORDER – 4

Hancock as they have advised us months later that it was returned NSF."), at 125 (May 21 email: "When will you provide this simple chronological info. to Mr. Dean.  I fail to understand why you don't want to cooperate."), at 128 (May 23 email from Mr. Dean: "You assured me that I would receive documents on Saturday afternoon but nothing has arrived.  I am sorry to have to put pressure on you but if I don't receive them today or at the latest tomorrow morning, I will have to make my own assumptions in the complaint that we are preparing to file . . . ."), at 127 (May 24 email: "Are you going to provide the material Mr. Dean is requesting or not?"), at 129 (May 24 email from Mr. Dean with a series of questions about Feb. 20 deposit).  Through this barrage of email, Mr. Trudeau steadfastly refused to reveal any useful information.

Finally, on May 24, Mr. Trudeau revealed what he had done.  He emailed Mr. Dean and Mr. Klein a copy of the check and the original deposit slip.  Appel Decl. (Dkt. # 39), Ex. F at 102-05.  He also emailed a summary in which he claimed that although he had intended to deposit funds to cover the check, he had not done so.  *Id.* at 106-07.  He claimed that he was unaware that the bank had returned the check.  *Id.* at 106.  He also offered to fund the payment for the first time.  *Id.* at 107.

It is not clear what ultimately became of the Policy.  It appears that Plaintiffs did not complete the transaction with the third party.  Whether they ultimately sold the Policy or otherwise received benefits from it is not apparent from the record.  Also unclear is whether Plaintiffs could have mitigated any damage by making additional payments or by demanding the cash surrender value of the Policy from John Hancock.  The record reveals that Plaintiffs sued John Hancock and later settled that suit, but there is no evidence as to what compensation Plaintiffs obtained or whether that compensation would offset their damage claims here.

What is clear is that Plaintiffs sued Mr. Trudeau and Greenwich Bay.  Their complaint contains two causes of action: one for breach of contract and one asserting that Mr. Trudeau is personally liable for that breach.  The parties have filed cross-motions for

ORDER – 5

summary judgment. Plaintiffs ask only for a ruling that Mr. Trudeau and Greenwich Bay breached the contract and that both Defendants are liable. They do not request summary judgment as to their damages. Defendants seek summary judgment against all of Plaintiffs' claims.

### III.  ANALYSIS

On motions for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in resolving purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

**A.   Was There a Contract?**

At the threshold, the court must determine if the Trust and Defendants entered into a contract. The party seeking to rely on a contract bears the burden of proving that a contract was formed. *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1165 (Wash. Ct. App. 2007). Washington follows the "objective manifestation test" to determine the existence of a contract. *Keystone Land & Development Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004). The "unexpressed subjective intention of the parties is irrelevant; the mutual assent of the parties must be determined by their objective acts or outward manifestations." *Ford v. Trendwest Resorts, Inc.*, 12 P.3d 613, 616 (Wash. Ct. App. 2000), *rev'd on other grounds*, 43 P.3d 1223 (Wash. 2002);

ORDER – 6

*Multicare Med. Ctr. v. Dep't of Soc. & Health Servs.*, 790 P.2d 124, 132-33 (Wash. 1990). Ordinarily, the objective manifestations of mutual assent are an offer by one party and an acceptance by the other. *Yakima County (West Valley) Fire Protection Dist. v. City of Yakima*, 858 P.2d 245, 255 (Wash. 1993). Parties need not reach perfect assent, but rather assent to a "core of common meaning" that determines both parties' performance obligations with enough certainty to fashion a legal remedy. *Ford*, 12 P.3d at 616-17 (quoting Restatement (2d) of Contracts, § 20 cmt. b (1979)).

There is no dispute that on February 20, Mr. Trudeau was aware that the Trust had urgent need to make a premium payment to keep the Policy in force. No contract existed at that time. When Mr. Trudeau made his "deposit" on February 20 and forwarded the "deposit" slip to Mr. Klein, any reasonable party would have believed that he was representing that he had made a $554,000 payment to John Hancock. At a minimum, it was clear that he expected to be repaid or otherwise compensated for this payment. The parties had not agreed, at the time, on the terms of repayment, but that is not dispositive. At the time Mr. Trudeau forwarded the deposit slip, the parties had mutually manifested assent to a contract whose essential terms were that Mr. Trudeau would be repaid or otherwise compensated for his $554,000 payment.

Of course, Mr. Trudeau made no actual payment. A jury could find that he lied, or a jury could find that he sincerely intended to transfer enough funds to cover the check he had written. But his objective manifestation was that he had made a payment on the Trust's behalf with the expectation of repayment or an opportunity to purchase or otherwise profit from the Policy. In short, he entered a contract with the Trust.

Mr. Trudeau cannot avoid the contract by invoking a portion of Washington's statute of frauds that requires a credit agreement to be in writing and signed by the creditor before it can be enforced against the creditor. RCW § 19.36.110. Plaintiffs correctly point out that a creditor must give written notice to a borrower in compliance

ORDER – 7

with RCW § 19.36.140 in order to invoke the credit agreement statute of frauds. RCW § 19.36.130. Mr. Trudeau did not give the mandatory notice.

**B.     Who Entered the Contract?**

At the time Mr. Trudeau entered the contract, there is no evidence that Plaintiffs were even aware that Greenwich Bay existed. So far as the record reveals, Plaintiffs first learned of Greenwich Bay when they received a copy of the bad check in late May 2010. It is possible that Plaintiffs learned earlier of Greenwich Bay and have simply failed to reveal that evidence. It is possible that Plaintiffs had constructive knowledge of Greenwich Bay because one or more of their agents knew of Greenwich Bay. But on this record, the only party who entered a contract with Plaintiffs was Mr. Trudeau.

Although Plaintiffs' have not communicated their intent to the court clearly, it appears that they would prefer that Mr. Trudeau be held solely liable and that they sued Greenwich Bay as a precautionary measure. It is Mr. Trudeau who is attempting to point the finger at Greenwich Bay. What Mr. Trudeau does not explain, however, is how he can take shelter in Greenwich Bay when there is no evidence that he purported to be acting on Greenwich Bay's behalf when he entered the contract. The court is aware of no legal theory wherein satisfying contract obligations by writing a check drawn on a corporate account (without disclosing as much to the other party to the contract) is a sufficient basis to hold the corporation liable for the misdeeds of the check's writer. Mr. Trudeau has not advanced such a theory. Mr. Trudeau did not disclose that he was purportedly acting on Greenwich Bay's behalf until well after he had entered the contract. He cannot avoid liability by belatedly wielding Greenwich Bay as a shield.

The court rules as a matter of law that Mr. Trudeau alone entered the contract with Plaintiffs, and that Mr. Trudeau alone is liable for its breach. The court's ruling makes it unnecessary to consider the parties' disputes about whether Plaintiffs could pierce Greenwich Bay's corporate veil to hold Mr. Trudeau personally liable.

ORDER – 8

**C.     Did Mr. Trudeau Breach the Contract?**

Mr. Trudeau breached the contract as a matter of law. The sole obligation the contract placed on Mr. Trudeau was to make the payment he had promised. He did not pay.

**D.     Did the Trust Incur Damages?**

A jury must decide what damages, if any, flow from Mr. Trudeau's breach. The court rejects Defendants' assertion that the Trust has no damages as a matter of law. A party may claim damages that were "reasonably foreseeable by the party to be charged at the time the contract was made." *Wilkins v. Grays Harbor Cmty. Hosp.*, 427 P.2d 716, 721 (Wash. 1967). When Mr. Trudeau made his "deposit," and at all times thereafter, he knew that the payment he falsely represented he had made was critical to keeping the Policy in force. He nonetheless refused to reveal his false representations, remaining silent until the Trust had lost an opportunity to sell the Policy to the third party. There is evidence that the Trust had the option to make a payment even after February 20 to keep the Policy in force, but it had no knowledge of the need to make that payment because of Mr. Trudeau's failure to reveal his breach of contract. The court cannot decide the Trust's damages as a matter of law. Among other things, a jury must decide if the Trust failed to mitigate its damages by failing to take options that would have kept the Policy in force. In addition, a jury or other finder of fact is entitled to consider to what extent the Trust's final disposition of the property profited the Trust. There is evidence, for example, that the Trust sued John Hancock and obtained a settlement. It is possible that the amount of that settlement may offset the Trust's damages. A jury may also consider what ultimately became of the Policy. Did it lapse? Is it still in force? Did the Trust ultimately sell it?

The Trust may proceed to trial to prove its damages. The court questions, however, whether Mr. Trudeau has any intent to appear for trial.

ORDER – 9

**E.      The Parties Must Give Input on How to Bring This Case to Judgment.**

As matters stand, Greenwich Bay is in default and Mr. Trudeau has no counsel. Mr. Trudeau is free to defend himself at trial, but he has shown little interest in appearing in this case. The court therefore orders as follows.

1) No later than January 10, 2014, Mr. Trudeau shall submit a statement to the court as to whether he will appear to defend himself at trial, and whether he maintains his request for a jury trial. Mr. Trudeau should assume that trial will occur in March 2014. Failure to timely submit a statement will be deemed an admission that Mr. Trudeau will not appear for trial.

2) If Mr. Trudeau declares his intent to appear for trial, the court will set a trial date and deadlines for pretrial submissions, including motions in limine.

3) If Mr. Trudeau does not declare his intent to appear for trial, Plaintiffs shall submit a detailed proposal for bringing their claims to judgment. In particular, Plaintiffs shall state whether they prefer to proceed to a jury trial where their claims will be tried without Mr. Trudeau's presence, or whether they prefer another method of adjudication. The statement is due no later than January 24, 2014.

4) If Mr. Trudeau declares his intent to appear for trial, Plaintiffs shall submit a statement explaining whether they intend to pursue judgment against Greenwich Bay and, if so, how they propose to do so. If Mr. Trudeau does not declare his intent to appear for trial, Plaintiffs shall explain how they intend to bring their claims against Greenwich Bay to a final resolution in conjunction with the statement identified in the previous paragraph.

//
//
//
//

ORDER – 10

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS Plaintiffs' motion (Dkt. # 38) in part and DENIES it in part.  The court DENIES Defendants' motion.  Dkt. # 36.  The parties shall comply with the court's orders in Part III.E above.

Dated this 20th day of December, 2013.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 11